*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. RODRIQUEZ-DORTCH, Minor.

UNPUBLISHED
June 9, 2022

No. 359657
Berrien Circuit Court
Family Division
LC No. 2020-000022-NA

Before: BORRELLO, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Mother appeals as of right the trial court's order terminating her parental rights to the minor child under MCL 712A.19b(3)(b) (caused or failed to prevent physical injury or abuse), (c)(*i*) (conditions of adjudication continue to exist), and (j) (reasonable likelihood of harm).[1] On appeal, mother only challenges the trial court's best-interests finding. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

The minor child was removed from the parents' care on March 3, 2020, after the trial court authorized a petition alleging that mother had brought the two-month-old child to the hospital on February 25 with swollen lips and a blister or rash on his collarbone, that a skull fracture was discovered while treating the child, that mother was unable to explain how or when this injury occurred, and that doctors believed the skull fracture was consistent with some type of impact or inflicted injury in light of the nature of the injury and the lack of a reported accident that could explain the injury. The petition sought termination of both parents' parental rights at the initial disposition. At the conclusion of the preliminary hearing, the child was placed with the Department of Health and Human Services (DHHS).

---

[1] The trial court also terminated father's parental rights to the child, but father is not a party to this appeal. Facts involving father will only be discussed as necessary to provide relevant factual context.

An amended petition was filed on November 20, 2020. This petition incorporated the allegations contained in the original petition and also contained additional allegations. However, the amended petition no longer contained the request to terminate mother's parental rights at the initial disposition. At a hearing on November 20, 2020, the trial court obtained jurisdiction with respect to mother based on her plea of admission to allegations in the original and amended petition. Mother admitted that she took her two-month-old child to the hospital on February 25, 2020, because the child had swollen, irritated lips. Mother did not have an explanation at the time for those injuries. Mother further admitted that during the course of treatment, the child was transferred to a different hospital and was diagnosed with a skull fracture. Mother indicated that she and her mother were the child's primary caregivers, and mother admitted to the allegation that she also did not have an explanation for how the skull fracture had occurred. Mother admitted that she had tested positive for marijuana at some point within approximately a week after she first brought the child to the hospital, that there had been previous incidents of domestic violence against her by father, and that father would care for the child while mother slept.

On May 25, 2021, a supplemental petition was filed seeking termination of mother's parental rights. The petition included new allegations, namely, that mother had been working with father at the same company without the approval of the DHHS and that mother had been misleading the DHHS about her continuing relationship with father.

A dispositional review and permanency planning hearing was held on May 25, 2021. Mother testified that father was present during the time when the child was injured and taken to the hospital in February 2020, which led to the initiation of this case. Mother explained that during that time period, she allowed father "to come over from time to time when I napped or whatnot, because he was homeless so he would take showers and sit." Mother testified that father was watching the minor child while mother slept on the night that she took the child to the hospital for the problems related to the child's mouth. Mother further testified that a friend had recently texted her and indicated that father had admitted that he accidentally burned the child's mouth when he fed the child while mother was sleeping that night. With respect to the issue involving mother and father working at the same company, mother claimed that she only learned that father was working at the same company after she had already been working there for approximately four or five months. She indicated that she never had any contact with him at work, and she left that employment after learning that father was working there. Mother also testified that she had not had any contact with father outside of work and that he did not live with her.

At the termination hearing, foster-care specialist Mikayla Valentine testified that she had been the initial caseworker beginning in late February or early March 2020. Mother's barriers at the beginning of the case included parenting skills, domestic relations, and emotional stability. Mother's initial psychological assessment was somewhat inconclusive because of her inconsistent responses and observed tendency to portray herself in the most positive light possible without acknowledging even typical "everyday stressors."

Valentine testified that her experience with mother was consistent with this observation from the psychological assessment. Valentine explained that when mother was terminated from her employment in November 2020, mother initially denied that she had been fired and claimed that she had left voluntarily. However, Valentine learned from mother's former employer that mother had actually been terminated for time card fraud.

Mother's explanations for the child's initial injuries that led to the removal also evolved over time. At the beginning of the case, mother had no explanation for how the child suffered burns to his mouth and a skull fracture, and mother maintained that she was the child's sole caregiver. After a couple weeks, mother claimed that it was possible the child fell out of a "bouncer" and onto the floor, causing his skull fracture. One of the child's treating doctors, however, opined that such a fall could not have caused a fracture of the severity incurred by the minor child. At that time, mother also denied being in a current relationship with father and denied that he was ever around the child. Mother later changed her story and stated that father would sometimes watch the child but only under mother's supervision. Mother also indicated at some point that her mother and sister sometimes cared for the child. Valentine testified that she was never able to arrive at a complete understanding of how the child's injuries occurred.

Valentine learned of further information that caused her to suspect mother and father were maintaining a relationship. Following a parenting time visit in March 2020, the police discovered father hiding in the refrigerator in mother's apartment, which led to mother being charged with harboring a fugitive.[2] The Facebook pages of mother and father were discovered in September 2020, and these pages showed consistent communications between mother and father indicating they were in a relationship. Near the end of October, Valentine informed mother's attorney about the Facebook pages and the pages were subsequently "put on private or deleted."

The child did well in foster care. His injuries healed and, although he experienced some difficulty with chewing and swallowing as a result of the mouth burns, those issues had been resolved through occupational therapy. The foster parents had been heavily involved in the child's healing process and medical appointments. Valentine observed a strong bond between the child and his foster parents and foster siblings, and she also acknowledged that mother demonstrated strong parenting skills with respect to physically caring for the child during parenting time and that a strong parent-child bond existed between them. Valentine worked on the case through February 2021, when Caylee Steele took over as the caseworker.

Steele testified that she was initially optimistic about the trajectory of the case. She had a positive relationship with mother and mother was involved in services. Mother also communicated well, did what was asked of her, and appeared to be open and honest during discussions. However, Steele's opinion changed as it "became clear" that mother "was not being honest about a lot of things, and the biggest thing was her relationship with [father]." Steele learned from mother's employer that mother and father were both working for that employer in the same department and on the same shift. Records indicated that mother and father started with this employer around the same time, were absent from work on the same days, and quit this employment around the same time. There were indications that mother and father held themselves out as a married couple. When confronted by Steele, mother denied knowing that father worked for the same employer before eventually admitting that she had known that father was working there from the time he started. Valentine opined that this situation, after all of the conversations with mother about the

---

[2] The supplemental petition alleged that father was at mother's residence in violation of his probation and a no-contact order. The petition further alleged that father was found by the Michigan State Police Fugitive Team.

importance of honesty, demonstrated mother had not benefitted from services and was still being dishonest.

Furthermore, Steele testified that employment records from mother and father's mutual employer indicated that father had listed mother's address as his address for purposes of employment and tax forms. DHHS records also indicated that father had listed mother's address as his address for purposes of requesting financial assistance. When Steele confronted mother with this information, mother denied having any contact with father, denied that he lived with her, and initially denied knowing that he worked at the same company. Mother later admitted that she was aware that father was working at the same company, but she maintained that she had not had contact with him.

Steele acknowledged that mother showed strong basic parenting skills and that there was a good bond with the child, but Steele expressed her concern about mother's continuing relationship with father—and mother's dishonesty about it—because father was considered a potential cause of the child's initial injuries. Steele opined that mother's unwillingness to discuss the child's prior injuries and her lack of honesty about her relationship with father hindered the process of determining whether the risk to the child had been alleviated.

Steele believed that it was in the child's best interest to terminate mother's parental rights because the barriers that existed at the beginning of the case remained and mother had not made any progress. Steele explained that she still did not have any "definitive answers" about how the minor child's injuries occurred and that mother's story had changed over time. In one version, mother reported being told by a friend of father's that father had caused the child's mouth burns by heating up the child's bottle too much. The child's injuries had been considered potentially life threatening. Because Steele did not have a clear idea of how the child had been injured, she could not be sure about what needed to change in order to protect the child from similar future injuries. The child's foster parents were interested in adoption, and Steele testified that there was a strong bond between the child and his foster parents based on the affection they showed him and the way the child interacted with the foster parents.

Steele worked on the case until June 11, 2021, when Anna Renkert took over. Renkert testified that in June 2021, mother called the police because father was yelling at her. Father was located at mother's apartment, arrested, and released. Father told the police that he also lived in that apartment. Mother told Renkert that father had attempted to break into the apartment. There were two more police reports from July 2021 involving disputes between mother and father at the apartment. Nonetheless, mother continued to tell Renkert that father was never in the apartment. Renkert agreed that mother's lack of honesty and apparent efforts to hide her relationship with father interfered with mother's ability to make progress in this case.

Father's history of domestic violence against mother was a major source of the concern about mother continuing a secret relationship with him. Both Valentine and Steele testified that father had a history of domestic violence against mother. At the beginning of the case, father was on probation based on a conviction for domestic violence against mother, and there was a no-contact order between them. There were multiple incidents of previous domestic violence between mother and father. Mother admitted to Valentine that there had been domestic violence but,

-4-

according to Valentine, mother also denied the occurrence of domestic violence in the relationship when interacting with certain service providers.

Steele testified that the continuing relationship between mother and father was problematic because father potentially caused the child's serious injuries and because there was a history of domestic violence between father and mother. Valentine testified that mother had been provided with "extremely intensive services" and that "[w]e had discussed numerous times the importance of her being honest with us." Further, Valentine opined that the situation with mother and father working together at the same company showed that mother "hadn't benefitted from any of the services we provided her, and that she was still being dishonest with us, which all puts [the child] in danger."

Mother testified at the termination hearing and admitted that she had been dishonest with the DHHS about her contact with father. She specifically admitted that she had been dishonest in denying that she had contact with father while working at the same company. Mother testified that she continued employment while father also worked for the same employer until she "had enough to be able to leave." She had been scared to tell the DHHS that father worked there, but she admitted at the hearing that she had "no excuse" for not being honest about it. Mother also testified that father had attempted to break into her apartment and that she called the police. Mother had not permitted father to use her address as his record address, and she claimed that father did not live with her. Mother testified that she was currently employed.

At a hearing held on September 20, 2021, the trial court announced its termination decision on the record. The trial court found that the circumstances surrounding the minor child's injuries that led to his initial hospitalization and the initiation of these child-protective proceedings remained unclear because mother had never provided any reasonable or believable explanation about how the injuries occurred or who was caring for the child on the night she brought him to the hospital. The trial court further found that mother was not being honest about who had access to the child during the relevant time period even though the child had suffered serious injuries. Additionally, the trial court noted the history of domestic violence between mother and father, the evidence that mother continued to have contact with father despite that history, and found that mother had been continuing her relationship with father and been dishonest throughout the case about her continued contact with father.

With respect to statutory grounds for terminating mother's parental rights, the trial court first found that there was clear and convincing evidence to support termination under MCL 712A.19b(3)(b) because mother had either caused the serious injuries to the child that led to his hospitalization at the outset of this case or had the opportunity to prevent those injuries and she had demonstrated her failure to benefit from services by continuing a relationship with father despite his history of domestic violence and failing to appreciate the need for providing accurate information about how the child was injured such that there was a reasonable likelihood the child would be injured or abused in the foreseeable future if returned to mother's care. The trial court similarly found that there was clear and convincing evidence to support terminating mother's parental rights under MCL 712A.19b(3)(c)(*i*), and (j).

Regarding the child's best interests, the trial court found that the child had been in foster care since he was three months old and had thus spent the majority of his young life in foster care

rather than in the care of his parents. The trial court also found that the child was bonded to his foster parents who were willing to provide him permanency, that permanency was especially important for this young child, and that mother's actions throughout the case had demonstrated that she would not be able to do what was necessary to provide permanency for the child within a reasonable time.

The trial court noted that mother had substantially complied with the case service plan "in that she has done what has been asked of her" but that mother had not been honest and was continuing to "engage in all of the behaviors today that she engaged in previously." Accordingly, the trial court found that she did not benefit from services. The court acknowledged the child's bond with mother and the tragic fact that mother was a victim of domestic abuse. However, the court explained that the focus at the best-interests stage was on the child and that mother had continued to maintain her relationship with father and had not shown that she could make the choice to do what was necessary to protect her child. The trial court found that the child would likely be in danger from father in the future and that mother's inability to protect the child was the "overwhelming concern." The trial court concluded that terminating mother's parental rights was in the child's best interests based on the child's need for permanency and stability, the lack of explanation for the child's serious injuries, and the evidence demonstrating that nothing was likely to change regarding mother's ability to parent the child.

Mother's parental rights were terminated. Mother now appeals.

## II. STANDARD OF REVIEW

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews a trial court's best-interests determination for clear error. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). A decision is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts Minors*, 297 Mich App at 41 (quotation marks and citation omitted).

## III. ANALYSIS

On appeal, mother expressly concedes that the trial court did not err by finding a statutory ground to support termination had been established. Mother only challenges the trial court's best-interests determination.

At the best-interest stage, the focus is on the child and not the parent. *In re Moss*, 301 Mich App at 87. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). The length of time that the minor child was in foster care or placed with relatives and the likelihood that the child could be returned to the parents' home within the foreseeable future are also proper factors to consider. *In re Frey*,

297 Mich App at 248-249. "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

Here, the trial court found that the young child had spent the majority of his life in foster care, that the child was bonded to the foster parents, and that the foster parents were willing to adopt the child and provide stability. The trial court noted mother's substantial compliance with doing "what has been asked of her" regarding to the case service plan, but the court found that mother had shown that she had not benefited from services because she had been dishonest, continued to maintain her relationship with father, and had demonstrated that she could not do what was necessary to protect the child and provide permanency for the child within a reasonable time. "Not only must respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). Based on these findings, the trial court determined that terminating mother's parental rights was in the child's best interests because of the child's need for permanency and stability, the lack of explanation for the child's serious injuries, and the evidence demonstrating that nothing was likely to change regarding mother's ability to parent the child. Review of the record evidence supports the trial court's factual findings and does not lead to a definite and firm conviction that a mistake was made. *In re White*, 303 Mich App at 713 ("The trial court should weigh all the evidence available to determine the children's best interests."). The trial court supported its best-interests determination by considering proper factors described by this Court. *In re Olive/Metts Minors*, 297 Mich App at 41-42; *In re Frey*, 297 Mich App at 248-249; *In re White*, 303 Mich App at 714.

Accordingly, it was not clear error for the trial court to conclude that a preponderance of the evidence established that termination was in the child's best interests even though there was also evidence that mother was employed and had a strong bond with the child. Mother's inability, at a minimum, to protect the child from severe injury and her demonstrated unwillingness throughout the case to honestly acknowledge and confront circumstances that presented a further risk of serious harm to the child—such as maintaining a relationship with father and his history of domestic violence against her—significantly outweighed the evidence that mother had employment and a strong bond with the child. *In re White,* 303 Mich App at 713. The focus is on the child, not the parent, at the best-interests stage. *In re Moss*, 301 Mich App at 87. The trial court did not clearly err by finding that termination was in the child's best interest.

Affirmed.

/s/ Stephen L. Borrello
/s/ Kathleen Jansen
/s/ Christopher M. Murray